IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
May 21, 2013 Session

# BRANDON WILLIAMS
v.
# KATIE SINGLER

**Appeal from the Juvenile Court of Tipton County**
**No. 09-JV-139   Rachel J. Jackson, Judge, sitting by interchange**

**No. W2012-01253-COA-R3-JV - Filed July 31, 2013**

This appeal involves the modification of a parenting plan.  The father filed a petition alleging a material change in circumstances and seeking to be designated primary residential parent for the parties' minor son.  After an evidentiary hearing, the trial court found that the mother had violated the parenting plan and held that this constituted a material change in circumstances. It changed the designation of primary residential parent from the mother to the father, held the mother in contempt, and awarded the father attorney fees as punishment for the contempt.  The mother now appeals.  The trial court failed to make sufficient findings of fact and conclusions of law as required under Tenn. R. Civ. P. 52.01. After a careful review of the evidence, we affirm the finding of a material change in circumstances, but hold that the trial court erred in holding that it was in the child's best interest to change the designation of primary residential parent from the mother to the father. We also vacate the holding of contempt against the mother and the award of attorney fees as punishment for the alleged contempt and remand for additional findings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed in Part, Reversed in Part, Vacated in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Frank Deslauriers, Covington, Tennessee, for Petitioner/Appellee Brandon Williams

Roscoe A. Feild, Memphis, Tennessee and Steven R. Walker, Oakland, Tennessee, for Respondent/Appellant Katie Singler

## OPINION

### FACTS AND PROCEEDINGS BELOW

Respondent/Appellant Katie Singler ("Mother") and Petitioner/Appellee Brandon Williams ("Father") had one child together, a son born in January 2008 ("Son"). The parties were never married to each other. Mother has been the child's primary caregiver since he was born.

After parentage proceedings were initiated in the Juvenile Court of Tipton County, Tennessee, in April 2009, Juvenile Court Judge William Peeler entered a consent order declaring Father to be Son's natural father. The consent order included an agreed permanent parenting plan that named Mother as the primary residential parent, gave Father alternate residential parenting time for two days each week on his days off work, and set Father's child support obligation.

In January 2010, Father filed a petition to modify the parenting plan to designate him as the primary residential parent and to hold Mother in civil contempt for allegedly refusing to allow his scheduled parenting time on "numerous occasions." Father's petition recited several occasions on which Mother interfered with his parenting time and described Mother as "volatile and unstable."

Father's petition set off a confusing course of proceedings. Mother's initial response was to file a motion to dismiss, asserting that the Tipton County Juvenile Court no longer had jurisdiction over the case. The Tipton County Juvenile Court held a hearing on Mother's motion to dismiss in May 2010. This prompted an apparently premature interlocutory appeal.[1]

In July 2010, before any hearing on Father's January 2010 petition to modify the parenting plan and before entry of any order resolving the jurisdiction of the Tipton County Juvenile Court, Father filed another petition with allegations similar to those in his January 2010 petition. This second petition contained the heading "Petition for Writ of Scire Facias for Contempt and Emergency Petition for Custody." This "emergency petition" asserted that Mother "continues to deny . . . visitation without any legal cause and without any

---

[1]The appellate record is unclear as to what became of Mother's interlocutory appeal, though court records indicate this appeal was dismissed in September 2010.

explanation," and asked the trial court to hold her in contempt for her denial of his parenting time. Father also alleged that Mother had lied to Father's supervisor in order to obtain Father's private cell phone number.

On August 11, 2010, again prior to entry of any order resolving Mother's motion to dismiss for lack of jurisdiction, an evidentiary hearing was held on Father's "emergency petition." The hearing was not held by Judge Peeler; it was conducted by Judge Rachel Jackson, by interchange. Judge Jackson conducted the hearing "to address visitation and contempt." The appellate record does not include a transcript of the hearing, but Judge Jackson apparently heard considerable testimony from both parties. During the hearing, after the trial court inquired about proof regarding harm to the child, the parties took a brief recess. After the recess, they announced that they had reached an agreement. By agreement, the proceedings were suspended and the issues of "Custody and/or Emergency Custody" were reserved. The parties agreed to "attempt to re-acclimate the child to the father" and to "strictly comply" with the existing parenting plan; the agreement included details on the times and days of Father's parenting time, and on the exchange of the child between the parents.

The next day, on August 12, 2010, Judge Peeler entered an order holding that the Tipton County Juvenile Court retained continuing exclusive jurisdiction because Father continued to reside in Tipton County. In the same order, Judge Peeler recused himself from hearing further proceedings in the matter, because Father was a police officer who often appeared in Judge Peeler's court.

A few days later, on August 16, 2010, Judge Jackson entered her order on the August 11, 2010 hearing. The order first denied Mother's motion to dismiss for lack of jurisdiction. In her order, Judge Jackson noted that Mother had moved, with the child, to Shelby County. The order held, however, that the Tipton County Juvenile Court retained subject matter jurisdiction because both parties and the child resided in Tipton County when the original parentage proceedings were initiated, and Father continued to reside in Tipton County. The order observed that Mother's attorney had informed the Tipton County Juvenile Court that "a modification and/or contempt proceeding was filed in Shelby County," and stated that because the Shelby County court was without jurisdiction, the Tipton County Juvenile Court would consider any order entered by the Shelby County court to be void.

The August 16, 2010 order set forth the parties' agreement resolving their parenting dispute, and found the agreement to be reasonable and in the child's best interest. The order stated: "[I]t is expressly ordered . . . that the parties will *strictly comply* with these provisions and that there be no deviation whatsoever from its terms without the written agreement of both parties." (emphasis in original). The order included no findings of fact.

Unfortunately, the August 16, 2010 agreed order did little to resolve the parties' disputes. Less than a month later, in September 2010, Mother filed an emergency petition to suspend Father's parenting time with their child and for a protective order. Mother's petition asserted that, when she picked up Son after his parenting time with Father, Mother saw a bruise on his buttock in the form of a hand print. Mother took the child to the hospital to be examined. After examining the bruise, Mother's petition said, the hospital staff contacted the police and the Tennessee Department of Children's Services ("DCS"). When police officers questioned the child about the bruise, the child said, "Daddy hit me because I went potty." The child's pediatrician apparently also examined the bruising; the pediatrician's notes described it as "likely signs of abuse." Mother's petition asserted that the child returned from visits with Father fearful about being spanked for making a mistake in his potty training. Mother alleged that Father had abused steroids in the past and asked for testing to determine if he was still abusing them. Mother's petition claimed that DCS, out of Shelby County, was investigating the incident regarding the child's bruising.

In response to Mother's petition, the trial court suspended Father's parenting time with the child, pending a preliminary hearing. It set a hearing for September 27, 2010. Shortly thereafter, Father filed a response denying the allegations of abuse. He also filed a "Counter-Petition for Immediate Custody and for Contempt." Father's counter-petition asserted that Mother had refused to permit him to see their child for his scheduled parenting time, in violation of the parenting plan, and that Mother's allegations against Father of abuse were "designed to cover up her own abuse of the child. . . ." Father asked the trial court to temporarily designate him as the primary residential parent, hold Mother in contempt of court, and grant Mother only supervised parenting time with the child.

The trial court held a preliminary hearing on Mother's emergency petition. The appellate record does not include a transcript or statement of the evidence from that hearing. After the hearing, the trial court entered an order vacating the protective order and enjoining both parties from using corporal discipline or discussing the legal proceedings with the child in a threatening way.[2] The order set a date for a final hearing on the remaining issues, motions, and petitions. It included no findings of fact.

In early March 2011, before resolution of Father's outstanding petition to change the designation of primary residential parent, Mother filed a petition to increase Father's child support obligation. Her petition asserted that his child support obligation was miscalculated in the original child support order, and that consequently, Father owed an arrearage.

---

[2]The order also required Father to provide documentation of health insurance for the child.

A few days later, on March 10, 2011, the trial court held a hearing on Father's petition to change the designation of primary residential parent and Mother's petition to modify child support. The appellate record does not include a transcript or statement of the evidence for that hearing. Several months later, on June 15, 2011, the trial court entered an order on the results of the March 2011 hearing. In the order, the trial court declined to modify the designation of primary residential parent or Father's parenting time under the parenting plan. The order granted Mother's petition to increase Father's child support and reserved Father's request to hold Mother in contempt of court. The order included no findings of fact.

After a brief lull of less than two months, in August 2011, Father filed yet another petition to change the designation of primary residential parent and to hold Mother in contempt of court. This petition alleged that Mother had made derogatory remarks to Father in the child's presence during an exchange, and that she "denied [Father] a visit and after [Father] returned home [Mother] then contacted [him] to pick up the child." Father claimed that Mother falsely told him that the child had Lyme disease in order to avoid his residential parenting time.

In response to Father's August 2011 petition, Mother filed a motion to compel mediation. The motion noted that the parties' parenting plan required them to mediate any disputes, and that Father had bypassed mediation in favor of filing another petition. Mother denied Father's allegation that she refused to permit his parenting time with the parties' child, noting that the child did in fact receive treatment "for a serious illness." She filed a counter-petition to modify the parenting plan and to hold Father in contempt, asserting that Father had refused to participate in the counseling ordered by the trial court and made derogatory remarks about Mother in the child's presence.

Father filed a response to Mother's motion to compel mediation, claiming that the parties' relationship was such that mediation would be futile. Despite this, the record indicates that the parties engaged in mediation, in which some, but not all, issues were resolved. The record does not indicate which issues were resolved in the mediation.

After several delays, in April 2012, the trial court held the hearing that is the subject of this appeal, an evidentiary hearing, at which both parties testified. The trial judge stated at the outset that the hearing was on Father's August 2011 petition to modify the parenting plan to change the designation of primary residential parent, and to hold Mother in contempt. The trial judge recalled that she had conducted "a trial in March 2011, . . . at which time my recollection is that I advised these parties that not only any subsequent matters between them would . . . be grounds for a strict modification of . . . his visitation or shared parenting, residential schedule, or her custody. . . ."

Much of the parties' testimony centered on their parenting disagreements in July and August of 2011, and in particular a dispute on July 4, 2011. Their accounts of the events contrasted significantly. Both also discussed the child's routine in his or her home, and concerns about the other's parenting.

Father's counsel called Mother as his first witness, and asked her about the events on July 4, 2011. Mother testified that her actions that day were not an attempt "to deny [Father] visitation." She explained that Son was bitten by a tick and later began running a high fever and throwing up; this prompted her to take the child to his pediatrician on July 2. She said that the pediatrician initially treated the child for Lyme disease because of his symptoms, though that was not the ultimate diagnosis. On July 4, the child was scheduled to begin a week of residential parenting time with Father. Apparently when Father came to Mother's home to pick up Son, Mother initially resisted allowing the child to go with Father to his home, telling Father that the child was sick and should not leave her house. She testified, however, that after an approximate five-and-a-half hour delay, she relented and drove the child to the exchange with Father for his residential parenting time. When asked what changed in the five-and-a-half hour interim, Mother said that she "just didn't want to argue with [Father] about it." The child stayed with Father for the full week, until July 11.

Asked whether Father's next residential parenting time with their child was delayed some five or six weeks until August 21, 2011, Mother acknowledged that Father missed some parenting time, but was unclear on how much was missed. Mother said that she did not deny Father any parenting time; she referred to an occasion on which Father did not show up for planned parenting time and later emailed Mother that there was a misunderstanding between the lawyers and work issues. Mother acknowledged that there was at least one other missed parenting time for Father; she seemed at first to relate the missed parenting time to the DCS investigation into Father's corporal discipline of their child and the involvement of both the Tipton County and Shelby County DCS offices, but then indicated that DCS did not have anything to do with the missed visit, adding vaguely that "it was a very confusing case."

Mother testified that, since the trial court's last hearing, Son came home from his parenting time with Father with a bruise between his shoulder blades.[3] Mother testified that Son told her, "Daddy hit me. And daddy says that I'm bad and I'm ugly and I'm a bad boy." Mother claimed that the child had said similar things to her several times, so she notified DCS about them. Mother testified that the child sometimes said things that concerned her upon returning from Father's home:

---

[3]Mother's testimony seems to indicate that this bruise was also in the shape of a handprint, but her testimony is unclear.

Each time it's different when he comes home. It's not always, he didn't have fun or there are sometimes when he comes home and he's . . . had fun. But the majority of it is: I didn't have fun, I just want to go home; or – an excuse my language – but I'm a fucking bitch, because Heather [Father's current wife] has told him that.

Mother confirmed that Son, at four years old, repeated such profanity to her after spending time at Father's home.

Mother testified that she lives with her mother and her stepfather. At the time of trial, Mother was employed at a restaurant two days a week and studying radiology in school, with classes arranged around the child's schedule. If she remained the primary residential parent, Mother said, Son would attend pre-kindergarten in the same location where he had attended Mother's Day Out, and Mother would take him to school each day. The child's maternal grandmother was self-employed and often available for childcare. Mother noted that both Father and his wife Heather worked full-time jobs, and that the parties' parenting plan provided for Father to have his residential parenting time on the two days each week when he was off work. She expressed concern that if Father were designated as the primary residential parent, they would "stick him in daycare . . . five days a week."

At the outset of his testimony, Father said that he works as a Sheriff's Deputy, five days a week from 3:00 p.m. to 10:00 p.m. He noted that, if he were designated as the primary residential parent, he could change his hours to 6:30 a.m. to 1:30 p.m., with his off days on Sunday and Monday. He said that his wife works for a car dealership, from 8:00 a.m. to 5:00 p.m. five days a week. Father complained that, as a result of Mother's complaints, he had been contacted numerous times by DCS and had to take drug tests. None of these, Father said, had resulted in any restriction in his contact with Son.

Father then described the problems with Mother over his parenting time. He said that his parenting time with the child went as scheduled during June 2011. His testimony on the July 4, 2011 incident roughly correlated with Mother's but provided more detail. Father said that, on July 4, he came to Mother's house at 10:00 a.m. to pick up Son for a week of residential parenting time, but Mother and the child were not there and he was initially unable to get in touch with her. Father testified that the Lyme disease issue was not the reason for Mother's resistance, because by July 4 the parties had already agreed that Father would pick up the child as planned and administer his medicine. He said that Mother alluded to other matters, such as child support, in their exchange of texts on July 4. Ultimately, Father picked up Son at 3:20 p.m. on July 4, and the child stayed with him the rest of the week, until July 11, as scheduled. After that, Father said, Mother denied him his scheduled parenting time until August 21, 2011. Father testified that Mother cited "money and things like that" as her

reason for refusing his parenting time, and at one point told him that "she had gotten court moved into Shelby County." In one text exchange when he was supposed to pick up the child, Father said, Mother texted him, "Don't waste your gas." After Father's parenting time with the child resumed in August 2011, Father said, there were no problems.

Father said that he was asking the trial court to designate him as the primary residential parent because the parenting time problems with Mother "seem[ed] to be a recurrence consistently." He said he could provide for the child financially, and had explored a nearby daycare and the school district in Munford. Father said that if he were designated as the primary residential parent, the child would attend daycare each day until his wife Heather got off work at 5:00 p.m.

At the conclusion of the testimony, the trial court issued an oral ruling from the bench. At the outset of its ruling, the trial court commented,

> [T]his is the third litigation of a similar nature and similar circumstances between these parties, and by that I mean a denial of visitation by the mother and the father essentially bringing her to Court alleging contempt on her part and showing that she's denied visitation and her alleging that in some way, form, or fashion that he's abused the child.

Responding to Father's criticism of Mother for contacting several agencies about her concerns that Father was abusing their child or was otherwise unfit, the trial court indicated that it attached little significance to this fact. The trial court observed that if Mother had good faith concerns about her child's welfare, she had "the right, maybe even the obligation, to pursue every legal means available to [her] to do something about it" and commented to Father, "Didn't you go through other legal avenues or something of that nature?"

However, after making this observation, the trial court noted that "upon pursuing allegations of abuse," Mother had "taken the child to the emergency room, she's taken the child to the pediatrician, she's made referrals to the Department of Children's Services . . . ." The trial court characterized the referrals to DCS as "investigated and unfounded." It stated that "there essentially [have] been no other finding[s] to substantiate that the father has abused this child in any way nor has committed any harm to the child" and found Mother's "[a]llegations of abuse are not credible in this matter because testimony established that referrals to DCS of allegations of abuse were investigated and unfounded."

After reciting the provisions of Tennessee Code Annotated § 36-6-101 on modification of a parenting plan,[4] the trial court held:

> The Court finds that there's been a material change of circumstances in that the mother has repeatedly and consistently violated the terms of the parenting plan in denying the father shared parenting rights essentially at any time litigation is not pending.
>
> And that's what happened here. The mother will violate the father's rights, the father will file litigation, the mother will comply.

The trial court stated, "[T]his happens with [Mother] every single time [Father] files litigation against her alleging contempt and noncompliance. She complies because she wants to come to Court and everything be rosy. . . .The mother's only impetus to comply is pending litigation." The trial court held that this material change in circumstance affected the child's best interest "in that there's a consistent denial of the relationship with the father."

Having found the requisite material change in circumstances, the trial court then addressed the second part of the two-part test, whether a change in the designation of primary residential parent is in the child's best interest, considering the factors in Tennessee Code Annotated §36-6-106(a):

> The child's best interest upon application of the factors set out in Tennessee Code Annotated 36-6-106 weigh in favor of an award of custody to the father. All factors are essentially equal with the exception of (a)10, which weighs heavily in favor of the father, that being:
>
> > Each parent or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent/child relationship between the child and both of the child's parents consistent with the best interest of the child.

---

[4]It is unclear whether the trial court was referring to Tenn. Code Ann. § 36-6-101(B), which sets forth the standard for changing the designation of primary residential parent, or whether it was referring to subsection (C), which sets forth the standard for a modification of the parenting plan that does not change the designation of primary residential parent. Subsection (B) would apply in this appeal, since the trial court changed the designation of primary residential parent from Mother to Father.

Again, all factors are essentially equal with the exception of (a)10 which weighs heavily in favor of the father who's consistently pursued and been denied a regular, routine residential schedule and loving bond with his child. Accordingly, custody is awarded to the father with the permanency plan to remain intact except as to primary residential status and alternate residential status being reversed and the support calculation being revisited to reflect reverse number of days spent with each parent.

The trial court found Mother in "willful contempt as a result of her failure to comply with the parenting plan," but found no reason to penalize Mother further.[5] It also awarded Father his attorney fees.

A few days later, the trial court entered a written order that was generally in line with its oral ruling. The order characterized the following as findings:

1. That this is the third litigation of similar circumstances between the parties. Specifically, the Respondent mother alleges that in some small way the Petitioner father has violated the Parenting Plan provisions to inconvenience her, and, in response, she denies him his residential time with the child for an extended period. At last hearing, by terms of the Order and Parenting Plan, the Court specifically admonished that either parent's failure to comply with the Parenting Plan provisions was a basis for modification of a party's custodial rights and/or parenting provisions. The mother has repeatedly and consistently violated the terms of the Parenting Plan in denying the father's shared parenting right at essentially any time that litigation wasn't pending. The mother's only impetus to comply with court order or the Parenting Plan is, in fact, pending litigation. While Respondent's counselor correctly asserts that there have been no problems between the parties with respect to the Parenting Plan since August, 2011, the record reflects that was the date on which the father filed the instant petition for contempt.

2. The mother's allegations of abuse by the father have been investigated and 'unfounded' by the Department of Children's Services, as acknowledged by both parties.

3. The mother's failure to comply with the Parenting Plan and her consistent denial of the father's ability to consistently exercise his residential periods with

---

[5]The trial court orally issued an "attachment *pro corpus*," stating that it chose to do so "because I expect that the mother will do pretty much everything in her power to prevent this. . . ."

the child and, therefore, to maintain his bond with the child, is a material change in circumstances, per T.C.A. §36-6-101.

4. The child's best interests, upon application of the factors set out in T.C.A. §36-6-106 weigh in favor of an award of custody to the father. All factors are essentially equal with the exception of (a)(10) which weighs heavily in favor of the father who has consistently pursued, and been denied, a regular, routine residential schedule and loving bond with his child. Further, the Court determines, after hearing from both parties, that the father is far more likely to recognize and provide for the mother's residential and shared parenting rights than she is for his.

5. The mother is capable of compliance with the Court order and her failure so to do is willful contempt.

The order then designated Father as the primary residential parent. Mother was given alternate residential parenting time and ordered to pay child support.

Inconsistent with its oral ruling, the trial court awarded Father his attorney fees and court costs as punishment for her contempt, rather than simply as an award stemming from child custody litigation. Mother now appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mother argues that the trial court erred in modifying the permanent parenting plan to designate Father as the primary residential parent, in holding Mother in contempt of court, and in awarding Father attorney fees as punishment for the alleged contempt.

Our review of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002); ***Marlow v. Parkinson***, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007). In this case, as discussed below, the trial court made few findings of fact to which we may accord a presumption of correctness. However as to the findings made by the trial court, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Walker v. Sidney Gilreath & Assocs.***, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); ***Realty Shop v. RR Westminster Holding, Inc.***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). In weighing the preponderance of the evidence, findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007).

"Trial courts have broad discretion to make decisions regarding parenting arrangements, but those determinations must be made based on proof and applicable principles of law." ***Coley v. Coley***, No. M2007-00655-COA-R3-CV, 2008 WL 5206297, at *6 (Tenn. Ct. App. Dec. 12, 2008). In light of the deference given to the trial court's decision in parenting matters, we will not disturb the trial court's parenting arrangement unless we determine that its decision is based on a material error of law, is against logic or reasoning, or is contrary to the preponderance of the evidence. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001); ***see also S.A.M.D. v. J.P.D.***, No. W2011-01256-COA-R3-CV, 2012 WL 5266194, at *14 (Tenn. Ct. App. Oct. 25, 2012); ***Dobbs v. Dobbs***, No. M2011-01523-COA-R3-CV, 2012 WL 3201938, at *2 (Tenn. Ct. App. Aug. 7, 2012) (citing ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). We review a trial court's application of the law to the facts *de novo*, with no presumption of correctness. ***State v. Ingram***, 331 S.W.3d 746, 755 (Tenn. 2011); ***Jahn v. Jahn***, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

## ANALYSIS

### Rule 52.01 Findings of Fact

At the outset, we must observe that the trial court below made few factual findings regarding the underlying facts in this case. For example, as to the primary factual dispute on Father's alternate parenting time, the trial court made only broad generalized statements such as: "The mother has repeatedly and consistently violated the terms of the Parenting Plan in denying the father's shared parenting right at essentially any time that litigation wasn't pending." However, the parenting time at issue for Father in the hearing below took place over a period of a few weeks, and the trial court made no factual findings as to particular occasions on which Father was denied his scheduled parenting time and why the denial occurred.

Effective July 1, 2009, Rule 52.01 was amended to require trial courts to make specific findings of facts and conclusions of law in all bench trials:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6).

Tenn. R. Civ. P. 52.01 (2012). Prior to July 1, 2009, trial courts were required to make specific findings of fact and conclusions of law only "upon request made by any party prior

to the entry of judgment." Tenn. R. Civ. P. 52.01 (amended 2008); *see also Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 791 n.12 (Tenn. Ct. App. 2010) (noting the amendment). As amended, Rule 52.01 requires the trial court to make these findings, even if neither party requests them. *See Poole*, 337 S.W.3d at 791 n.12. "Because . . . custody [is] clearly at issue in this case, the Rules of Civil Procedure govern the proceedings in the Juvenile Court." *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4 (Tenn. Ct. App. Nov. 8, 2012).

The importance of Rule 52.01 findings of fact and conclusions of law cannot be underscored enough, particularly in a fact-intensive matter such as a case in which the parenting arrangement is at issue. "Without such findings and conclusions, this court is left to wonder on what basis the [trial] court reached its ultimate decision." *In re K.H.*, No. W2008-01144-COA-R3-CV, 2009 WL 1362314, at *8 (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *19 (Tenn. Ct. App. Apr. 21, 2004)). In cases involving a change in the designation of primary residential parent in particular, the Legislature requires the trial court to make findings "as to the reason and the facts" supporting its decision to change the parenting arrangement. Tenn. Code Ann. § 36-6-101(a)(2)(B)(i); *Garrett v. Garrett*, No. E2012-02168-COA-R3-CV, 2013 WL 1503033, at *5; 2013 Tenn. App. LEXIS 268, at *12 (Tenn. Ct. App. Apr. 12, 2013).

Since Rule 52.01 was amended to require findings of fact and conclusions of law even in the absence of a request, this Court has remanded the case to the trial court in numerous cases with directions to issue such findings and conclusions. *See, e.g., Pandey v. Shrivastava*, No.W2012-00059-COA-R3-CV, 2013 WL 657799, at *5-6 (Tenn. Ct. App. Feb. 22, 2013); *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *5-6; 2012 Tenn. App. LEXIS 909, at *15-16 (Tenn. Ct. App. Dec. 27, 2012); *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4-5, 7 (Tenn. Ct. App. Nov. 8, 2012); *Simpson v. Fowler*, No. W2011-02112-COA-R3-CV, 2012 WL 3675321, *4-5 (Tenn. Ct. App. Aug. 28, 2012). This is because the absence of findings of fact and conclusions of law may render the appellate court unable to conduct an effective review of the trial court's decision. *See Estate of Bucy v. McElroy*, No. W2012-02317-COA-R3-CV, 2013 WL 1798911, at *3-4 (Tenn. Ct. App. Apr. 26, 2013) (noting that Rule 52.01 requirement serves purpose of facilitating appellate review); *Pandey*, 2013 WL 657799, at *6 (remanding case because unable to conduct meaningful review).

In the absence of sufficient findings of fact, however, the appellate court may choose to conduct its own independent review of the record to determine where the preponderance of the evidence lies, without presuming the trial court's decision to be correct. *See Kendrick*, 90 S.W.3d at 570; *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999); *see also Ward v. Ward,* No. M2012-01184-COA-R3-CV, 2013 WL 3198157, at *15 (Tenn. Ct. App. June 20,

2013); *Coley*, 2008 WL 5206297, at *6; *Curtis v. Hill*, 215 S.W.3d 836, 839 (Tenn. Ct. App. 2006). In this case, we deem it prudent to do so. *See Ward,* 2013 WL 3198157, at *15; *In re S.J.*, 387 S.W.3d 576, 594 n.9 (Tenn. Ct. App. 2012).

## Change in Designation of Primary Residential Parent

Parenting decisions are among the most important faced by the courts. *Wall v. Wall*, No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *21; 2012 Tenn. App. LEXIS 385, at *64 (citing *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001)); *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Decisions on parenting arrangements "should be directed towards promoting the child's best interest by placing him in an environment that will best serve his physical and emotional needs." *In re T.C.D.,* 261 S.W.3d 734, 742-43 (Tenn. Ct. App. 2007). Courts strive to devise a parenting arrangement that promotes the development of the child's relationship with both parents and interferes as little as possible with family decision-making. *See Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993); *Adelsperger*, 970 S.W.2d at 484. "In making parenting decisions, the court's paramount concern must be the welfare and best interest of the children; parenting decisions must not be made to reward or punish parents." *Irvin v. Irvin,* No. M2011-02424-COA-R3-CV, 2012 WL 5993756, at *14 (Tenn. Ct. App. Nov. 30, 2012) (citing *Adelsperger*, 970 S.W.2d at 484-85); *Griffin v. Stone*, 834 S.W.2d 300, 302 (Tenn. Ct. App. 1992); *Barnhill v. Barnhill*, 826 S.W.2d 443, 453 (Tenn. Ct. App. 1991).

When presented with a request to modify a parenting arrangement, the existing parenting order is considered *res judicata* on the facts as they existed at the time the most recent order was entered. *See Rigsby v. Edmonds*, 395 S.W.3d 728, 735 (Tenn. Ct. App. 2012) (citing *Steen,* 61 S.W.3d at 327). However, "Tennessee courts are statutorily authorized to modify custody arrangements as necessitated by intervening changes in circumstances" and "retain[] control over the custody of a minor child and may make such changes in the custody order as the exigencies of the case may require." *Conner v. Conner*, No. W2007-01711-COA-R3-CV, 2008 WL 2219255, at *2; 2008 Tenn. App. LEXIS 320, at *6 (Tenn. Ct. App. May 29, 2008); *Steen,* 61 S.W.3d at 327 (citing *Adelsperger*, 970 S.W.2d at 485). The Tennessee statute governing the modification of an existing parenting arrangement provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. . . . A material change in circumstance may include, but is not limited to, failures to adhere to the

-14-

parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B)(2010).

Thus, in order to modify an existing parenting arrangement, the parent who seeks to change the designation of the primary residential parent first must prove the requisite material change in circumstances. *See* Tenn. Code Ann. § 36-6-101(a)(2)(B)(2010); *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick*, 90 S.W.3d at 570). If the trial court finds a material change in circumstances, it then must ascertain whether a change in the designation of primary residential parent is in the child's best interest, considering the factors in Tennessee Code Annotated § 36-6-106(a). *See Wall,* 2011 WL 2732269, at *24; 2011 Tenn. App. LEXIS 385, at *73 (citing *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007)). The determination of whether a material change in circumstances has occurred, and whether such a change necessitates a modification of the parenting arrangement, are both questions of fact for the trier of fact. *Wall,* 2011 WL 2732269, at *21; 2011 Tenn. App. LEXIS 385, at *63 (citing *In re T.C.D.*, 261 S.W.3d at 742).

### *Material Change in Circumstances*

In this case, the trial court held: "The mother's failure to comply with the Parenting Plan and her consistent denial of the father's ability to consistently exercise his residential periods with the child and, therefore, to maintain his bond with the child, is a material change in circumstances." On appeal, Mother argues that the fact that Father filed multiple petitions asserting that Mother had denied him his allocated alternate parenting time does not equate to a finding that she did so. Mother maintains that the trial court's decision was "based on nothing more than the assertion of a five hour delay in a week-long visitation, when the delay was caused by Mother's concern for her very sick child." She argues that the trial court's conclusions are not supported by the preponderance of the evidence and that Father should not have been deemed a credible witness.

In response, Father claims that the trial court's finding of a material change in circumstances was based on many visits he was denied, not just the July 4 incident. He states: "[M]other does not deny that [F]ather missed visits from July 4th until August 21st."

We address first the period of time at issue in the proceedings below. In August 2010, the trial court entered an order that included an agreed parenting plan for the parties. The agreed plan resolved the parenting disputes that preceded, and the trial court made no factual finding on either party's misbehavior. The order only admonished both parties to "*strictly comply*"

-15-

with the agreed parenting plan, with no indication that one party or the other was at fault for the disputes that led to the agreed order. Despite the trial court's admonition, disputes soon arose; these culminated in the trial court's June 15, 2011 order, in which the trial court declined to grant Father's request to designate him as the primary residential parent or to modify the parenting plan. This order likewise contained no findings of fact.

Thus, as of June 15, 2011, the record reflects many pleadings and disputes between the parties, but no finding that Mother had, up to that point, violated the parenting plan or denied Father his allocated alternate parenting time. Indeed, it indicates that she had not, since Father's request for relief against Mother was denied. In August 2011, Father filed the petition that is the subject of this appeal, asserting that Mother had denied him his scheduled parenting time. This marks the time period at issue in this appeal.

Assuming that the trial court credited Father's testimony in the hearing below, Father testified that there were no problems between the parties in June 2011. On July 4, 2011, there was the 5-hour delay in Father's week-long scheduled parenting time, when the child was being treated for symptoms that were consistent with Lyme disease but turned out not to be such. This incident was the subject of detailed testimony. Father returned the child to Mother's home on July 11, 2011. After that, Father said, Mother denied him his scheduled parenting time until August 21, 2011. It is unclear in the record how many scheduled visits Father was denied, the number of days involved, and what occurred on each such occasion.[6] In general, Father testified that Mother cited "money and things like that" as her reason for refusing his parenting time, and at one point told him that "she had gotten court moved into Shelby County."[7] In one text exchange when he was supposed to pick up the child, Father recounted that Mother texted him, "Don't waste your gas." After Father's parenting time with the child resumed in the latter part of August 2011, Father said, there were no problems. Therefore, it appears that the scheduled parenting time at issue in this appeal was roughly a month, from about July 18, 2011 to August 21, 2011.

The testimony outlined above is sufficient for the trial court to conclude that Father was, on more than one occasion between July 18, 2011 and August 21, 2011, denied his scheduled

---

[6]Mother's testimony on Father's parenting time between July 11, 2011 and August 21, 2011 was very vague and even evasive, and we presume for purposes of appeal that the trial court did not credit her version of these events.

[7]Father sought to introduce into evidence a record of the text exchanges between him and Mother that might have contained more detail on specific dates and Mother's ostensible reasons for not permitting the child to go to Father's home for his scheduled parenting time. However, the trial court ended up excluding the text records from the evidence at trial, and that decision was not appealed, so they were not considered in this appeal.

alternate parenting time, and that Mother did not offer a valid reason for her refusal to permit it. The evidence, however, is *not* sufficient to support the trial court's sweeping statements that Mother had "repeatedly and consistently violated the terms of the Parenting Plan in denying the father's shared parenting right at essentially any time that litigation wasn't pending," and that "[M]other's only impetus to comply with court order or the Parenting Plan is, in fact, pending litigation." There are no past findings by the trial court to show that Mother in fact interfered with Father's parenting time prior to July 2011.

The trial court was well within its discretion to consider its impression of both parties from the prior proceedings in the case, such as impressions of the parties' truthfulness or overall willingness to foster an amicable co-parenting relationship with the other parent. Indeed, the trial judge's history with parties in ongoing litigation is often invaluable to the achievement of a fair and just resolution. However, the trial court's impressions are no substitute for actual findings of fact and conclusions of law in the record. Here, for example, in one prior dispute between these parties, the trial court conducted an evidentiary hearing and heard evidence, but that dispute was resolved by agreement of the parties. In the prior evidentiary hearing, the trial court may have gained an impression of the parties' relative fault in their ongoing disputes. It was not error for the trial judge to allow those prior impressions to inform her assessment of the parties' testimony in the hearing that is the subject of this appeal. However, unless the prior proceedings resulted in actual findings against Mother, the prior impressions cannot be the basis for a finding by the trial court that Mother had "repeatedly" violated the Parenting Plan and that she had demonstrated a pattern of compliance only when Father had litigation pending against her.

We note that, to qualify as "material," the change in circumstances must be "one that affects the child's well-being in a meaningful way." *See Kendrick,* 90 S.W.3d at 570 (citation omitted). Again, as noted above, since the evidence supports only a finding that Father's scheduled parenting time was denied for more than one occasion over a time period of about a month, this does not appear to be a "consistent" denial of parenting time. However, it is not an insignificant infringement on the child's time with his father. From our review of the record, we find the evidence sufficient to support a factual finding of a material change in circumstances.

### Best Interest

Having found that the evidence supports the trial court's finding of a material change in circumstances, we consider its finding that a change in the designation of primary residential parent is in the child's best interest.

Mother argues that, in making its best interest determination, the trial court failed to consider Tennessee Code Annotated §§ 36-6-106 (a)(3) and (a)(8), that is, the factors of continuity and which parent has been the child's primary caregiver. She contends that the trial court's best interest determination was "flawed" and that the proof does not establish that it would be in Son's best interest to change the designation of primary residential parent.

In response, Father dismisses Mother's best interest argument as "a rehash" of her arguments on Father's alleged abuse; he says that Mother's allegations of abuse "were not proven and were nothing more than a ploy to deny [F]ather visitation." He contends that Mother obtained counseling for the child only "for the purpose of making another abuse allegation," so the factor of continuity should not be determinative.

The trial court below made no specific factual findings to support its ruling on the child's best interest. As noted above, such factual findings are required under Tenn. R. Civ P. 52.01. We recognize that "there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination." *Hardin*, 2012 WL 6727533, at *2; 2012 Tenn. App. LEXIS 909, at *6. Nevertheless, Section 36-6-106(a) "requires the trial court to consider all the applicable factors." *Hardin,* 2012 WL 6727533, at *2; 2012 Tenn. App. LEXIS 909, at *6 (citing *Murray v. Murray,* No. M2009-01576-COA-R3-CV, 2010 WL 3852218, at *8 (Tenn. Ct. App. Sept. 28, 2010)). To facilitate meaningful appellate review, this Court has encouraged trial courts to "be as precise as possible in making child custody findings." *In re Elaina M.,* No. M2010-01880-COA-R3-JV, 2011 WL 5071901, at *8; 2011 Tenn. App. LEXIS 582, at *28 (Tenn. Ct. App. Oct. 25, 2011).

In the order that is the subject of this appeal, the trial court held:

> All factors [in Section 36-6-106(a)] are essentially equal with the exception of (a)(10) which weighs heavily in favor of the father who has consistently pursued, and been denied, a regular, routine residential schedule and loving bond with his child. Further, the Court determines, after hearing from both parties, that the father is far more likely to recognize and provide for the mother's residential and shared parenting rights than she is for his.

Thus, the trial court held that the statutory factor set forth in Section 36-6-106 (a)(10) – "the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents" – weighed in favor of designating Father as the primary residential parent. All of the other statutory factors, the trial court stated, "are essentially equal." Thus, the trial court

apparently concluded that factor (a)(10) tipped the scales enough to warrant changing the designation of primary residential parent.

After careful review of the record, we must conclude that, while the evidence supports the trial court's finding on factor (a)(10) – Mother's willingness and ability to facilitate the child's relationship with Father – the proof does not support the trial court's change of primary residential parent. We recognize the importance of the primary residential parent's willingness to support the other parent's relationship with their child; on numerous occasions, we have affirmed a change in the designation of primary residential parent where the evidence shows that the current primary residential parent has consistently interfered with the other parent's relationship with the child:

> This Court has repeatedly affirmed trial court decisions to change the designation of primary residential parent where, for example, the custodial parent has persisted in levying baseless accusations of child abuse against the alternate residential parent, so as to prevent sabotage of the children's relationship with the alternate residential parent by the accusing parent. See *Byars v. Young*, 327 S.W.3d 42, 49-50 (Tenn. Ct. App. 2010); *see also Keisling v. Keisling*, 196 S.W.3d 703, 722 (Tenn. Ct. App. 2005) (finding that change in primary residential parent was necessitated by the mother's unfounded accusations of sexual abuse); *Agee v. Agee*, No. W2007-00314-COA-R3-CV, 2008 WL 2065996, at *7-8 (Tenn. Ct. App. May 16, 2008) (same); *George v. Mullican*, No. M2000-01106-COA-R3-CV, 2001 WL 673700, at *1[-2] (Tenn. Ct. App. June 18, 2001) (same).

*Irvin,* 2012 WL 5993756, at *15 (Tenn. Ct. App. Nov. 30, 2012). This reflects "[t]he importance the legislature places on the continued involvement of both parents in the child's life. . . ." *Id.* at *15 n.11; *see also S.A.M.D.,* No. W2011-01256-COA-R3-CV, 2012 WL 5266194, at *18 (Tenn. Ct. App. Oct. 25, 2012). As discussed above, however, the evidence in the record before us does not support the trial court's broad conclusion that Mother consistently interfered with Father's relationship with the child; instead, it indicates that she resisted Father's parenting time for a period of approximately a month. Moreover, the undisputed testimony showed that, after the month-long period in which Mother resisted Father's parenting time, she discontinued any interference in his relationship with their child. The trial court held that Mother's "only impetus to comply [with the parenting plan] is pending litigation." The evidence supports a finding that Mother's compliance in this instance was motivated by the filing of Father's petition in August 2011, but as noted above, this record does not contain prior findings by the trial court to show a pattern of complying only in the face of pending litigation. A pattern of such misconduct, rather than a single instance, has normally been the basis for a change in the designation of primary residential

-19-

parent. *See, e.g., S.A.M.D.,* 2012 WL 5266194, at *8. Mother's eventual compliance with the parenting plan after August 21, 2011, whatever her reason, may fairly be taken into account in determining the child's best interest. *Irvin,* 2012 WL 5993756, at *17.

The evidence also does not support the trial court's holding that all of the other statutory factors that must be considered in making a best interest determination "are essentially equal." Specifically, this holding fails to take into consideration the factors set forth in subsections (a)(2) and (a)(3), "the degree to which a parent or caregiver has been the primary caregiver," and "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. . . ." *See* Tenn. Code Ann. § 36-6-106(a)(2) and (3). "[C]ontinuity and the parent who has been the child's primary caregiver are often 'powerful considerations' in custody disputes." *See Ward,* 2013 WL 3198157, at *20 (quoting *Wall*, 2011 WL 2732269, at *30). "[C]ourts faced with a request for modification of the designation of a child's primary residential parent emphasize the importance of continuity in the child's life, and so are normally disinclined to change the original designation. This is based on the premise that children tend to thrive in a stable environment." *S.A.M.D.,* 2012 WL 5266194, at *18 (citing *Aaby*, 924 S.W.2d at 627). Thus, there is "a strong presumption in favor of continuity of placement" of a child. *Morris v. Morris*, No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2; 2002 Tenn. App. LEXIS 673, at *7 (Tenn. Ct. App. Sept. 17, 2002) (quoting *Hoalcraft v. Simpson*, 19 S.W.3d 822, 828 (Tenn. Ct. App. 1999)). In the case at bar, there is no evidence in the record that Mother's home was an unstable or unsatisfactory environment; Father's arguments in favor of changing the designation of primary residential parent focused almost exclusively on his assertion that Mother interfered with his relationship with their child. Under these circumstances, continuity of placement for the child must weigh heavily into the best interest determination.

In addressing Mother's allegation that Father's discipline amounted to abuse that left the child bruised and fearful, the trial court stated that "there essentially has been no other finding to substantiate that the father has abused this child in any way nor has committed any harm to the child" and found Mother's "[a]llegations of abuse are not credible in this matter because testimony established that referrals to DCS of allegations of abuse were investigated and unfounded." Respectfully, this conclusion is likewise not supported by the evidence.

The record in fact contains no evidence that shows how the DCS investigation prompted by the child's bruises was resolved, or if in fact it had been resolved by the time of trial. Mother testified that the medical professionals who examined Son made a referral to DCS, and that she subsequently made referrals as well. Father testified that DCS either contacted him or came to his home on over 10 occasions. In direct examination, Father was asked, "As a result of any of those contacts has [Son] been removed from you or your visitation been

limited in any way by anybody?" He responded, "No, sir." This is not sufficient for the trial court to conclude that DCS had reached the conclusion that the allegations as to Father were "unfounded." Moreover, the trial court deferred to the perceived "finding" by DCS and failed to make its own determination on whether Father's discipline of the child was excessive or inappropriate. Mother's testimony established that Son came home from Father's house with bruising, and that the child complained that Father hit him and indicated that he was fearful of being struck for failures in potty training. In the hearing, Father testified that he loves Son, but did not address or refute Mother's allegations that his discipline was excessive and inappropriate.[8] The trial court made no finding on this issue other than its erroneous deferral to a "finding" by DCS that does not appear in the record.

We feel compelled as well to address a statement made by the trial court at the hearing below. At the outset, the trial judge recalled that, in the immediately prior proceeding, she "advised these parties that . . . any subsequent matters between them would . . . be grounds for a strict modification of . . . his visitation or shared parenting, residential schedule, or her custody. . . ." She added: "[T]hey bicker quite a bit and I have warned them that if we were back in court again, it would be grounds – if I found either of them to be in contempt or in violation of the Court's Order, it would be grounds for a strict curtailing of one of their rights."

We understand that trial judges are human and may lose patience with "bickering" parents who are in court repeatedly with parenting disputes. However, such blanket "warnings" addressed to both parties are ill advised. They contribute to a perception that, instead of making a reasoned decision based on the child's best interest, the trial court's ultimate ruling was based on exasperation, punishment for the parent who dared trouble the trial judge with yet another court proceeding. "Custodial arrangements should not be made with the goal of punishing a parent for misconduct." *Barnhill,* 826 S.W.2d at 453. "Parenting decisions should not be intended or designed 'to reward parents for prior virtuous conduct, nor to punish them for their human frailties or past missteps.' " *Wall*, 2011 WL 2732269, at *26 (quoting *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006)). "Always, the best interest of the child is paramount." *Id.* at *26.

In the case at bar, as noted above, the record contains no finding by the trial court that Mother had previously violated the parenting plan. The trial court's admonition that one more transgression by either party would result in "strict curtailing" of the errant parent's access to his or her child is inconsistent with the trial court's solemn responsibility to make parenting decisions based on the law, the evidence, and child's best interest.

_____

[8]In pleadings filed in connection with prior hearings, Father denied any abuse. The record does not include any testimony given in the prior hearings, and there were no findings by the trial court.

The trial court's decision on the parties' parenting arrangement "must be made based on proof and applicable principles of law." *Coley,* 2008 WL 5206297, at \*6. Considering the record as a whole, we must conclude that the evidence preponderates against the trial court's finding that it is in the child's best interest to change the designation of primary residential parent to Father. Therefore, we must respectfully conclude that the trial court abused its discretion in modifying the parenting plan to designate Father as the child's primary residential parent.

On remand, the trial court is directed to reverse its designation of Father as the child's primary residential parent. However, we are mindful that transition will be needed. "[E]vents and lives have not stood still while this custody dispute has been in the courts." *Maxwell v. Woodard,* No. M2011-02482-COA-R3-CV, 2013 WL 2420500, at \*22 (Tenn. Ct. App. May 31, 2013) (quoting *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at \*4 (Tenn. Ct. App. July 21, 1999)); *see also Hawkins v. O'Brien*, No. M2008-02289-COA-R3-CV, 2009 WL 2058802, at \*6 (Tenn. Ct. App. July 15, 2009). Therefore, on remand, the trial court is vested with discretion to fashion a parenting arrangement, designating Mother as the child's primary residential parent, that provides for appropriate transition and serves the child's overall best interests.

## Contempt

Mother argues on appeal that the trial court erred in holding her in contempt of court and requiring her to pay Father's attorney fees as punishment for the contempt. We review a trial court decision regarding whether a person violated a court order under Tenn. R. App. P. 13(d). *See Konvalinka v. Chattanooga-Hamilton-Cnty. Hosp. Auth.*, 249 S.W.3d 346, 356 (Tenn. 2008).

The order from which Mother appeals states that Mother "is in willful contempt of Court and that a material change in circumstances exists." The order says that Mother "has repeatedly and consistently violated the terms of the Parenting Plan in denying the father's shared parenting right at essentially any time that litigation wasn't pending." It holds that "[t]he mother's contempt is punishable by the assessment to her of [Father's] attorney's fees and court costs. . . ."

As we have addressed above, the trial court failed to make any findings of fact on specific occasions on which Mother violated the parenting plan, during the period of time at issue in the hearing below, from roughly July 18, 2011 to August 21, 2011. Likewise, while the trial court reached the legal conclusion that Mother's "consistent" violation of the parenting plan was willful, it failed to make factual findings as to any specific instances in which Mother

violated the parenting plan. Moreover, the trial court did not indicate whether the contempt of court was civil or criminal.[9]

In contrast to the trial court's holding on the change in designation of primary residential parent, the evidence in the record is overall sufficient to hold that Mother violated the parenting plan during the period of time between approximately July 18, 2011 and August 21, 2011 by unreasonably refusing to permit Father his scheduled residential parenting time with their child. However, the trial court's failure to make specific factual findings, and its failure to clarify whether the contempt at issue is civil or criminal has "render[ed] the appellate court unable to conduct an effective review of the trial court's decision" on

_____

[9]The Court in *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust* explained the difference in the purpose and standards for criminal contempt and civil contempt:

> Contempt may be either criminal or civil. Criminal contempt is used to "preserve the power and vindicate the dignity and authority of the law" as well as to preserve the court "as an organ of society." *Black [v. Blount]*, 938 S.W.2d [394,] 398 (Tenn. 1996); *see also State ex rel. Anderson v. Daugherty*, 191 S.W. 974 ([Tenn.]1917). Generally, sanctions for criminal contempt are designed to punish the contemnor and are unconditional in nature. *Black*, 938 S.W.2d at 398. It is issued as punishment and is unconditional. *Ahern [v. Ahern]*, 15 S.W.3d [73,] 79 [(Tenn. 2000)].
>
> Civil contempt, however, occurs when a person refuses or fails to comply with a court order and a contempt action is brought to enforce private rights. *Black*, 938 S.W.2d at 398 (citing *Robinson v. Air Draulics Engineering Co.,* 214 Tenn. 30, 377 S.W.2d 908, 911 (Tenn. 1964)). Civil contempt sanctions are remedial and coercive in character, designed to compel a party to comply with the court's order. *Daugherty*, 191 S.W. at 974; *see also State v. Turner*, 914 S.W.2d 951, 955 (Tenn. Crim. App.1995). Unlike criminal contempt, the contemnor can purge the contempt by complying with the court's order. *Ahern*, 15 S.W.3d at 79*; see also Doe v. Board of Prof'l Responsibility*, 104 S.W.3d 465, 473 (Tenn.2003) (holding civil contempt, unlike criminal contempt, is designed to coerce an individual to comply with a court's order).

*State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust,* 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006); *see also Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005) (noting that criminal contempt requires a defendant's guilt to be "established by proof beyond a reasonable doubt" and that certain constitutional safeguards are triggered).

However, a fine can be imposed for civil contempt to compensate the injured party for the injury sustained. *Overnite Transp. Co.*, 172 S.W.3d at 511 (noting that Tenn. Code Ann. § 29-9-105 "combines punishment to vindicate the court with damages to compensate the party for injury arising from the illegal disobedience of the court.") *See* Tenn. Code Ann. § 29-9-105 ("If the [civil] contempt consists in the performance of a forbidden act, the person may be imprisoned until the act is rectified by placing matters and person in status quo, *or by the payment of damages*.") (emphasis added).

contempt. *See Pandey*, 2013 WL 657799, at *6 (remanding case because unable to conduct meaningful review); *Estate of Bucy*, 2013 WL 1798911, at *3 (noting that Rule 52.01 requirement serves purpose of facilitating appellate review). Moreover, under these circumstances, we are unable to conduct our own independent review of the record to determine where the preponderance of evidence lies and whether the standards for the contempt, either civil or criminal, have been met. *See Pandey*, 2013 WL 657799, at *6.

In the absence of findings of fact or indication of whether the contempt is civil or criminal, we are left with little choice but to vacate the finding of contempt and remand for specific findings pursuant to Tenn. R. Civ. P. 52.01. Because the award of attorney fees against Mother was made as punishment for the alleged contempt, that must be vacated as well.

To clarify, on remand, as to any finding of contempt of court, the trial court is directed to make factual findings as to specific instances of contempt during the relevant time period, including factual findings to support a holding of willfulness. The trial court's order should indicate whether the contempt is civil or criminal; if criminal, the order should also address the standard of proof and the constitutional safeguards. *See Overnite Transp. Co. v. Teamsters Local Union No. 480*, 172 S.W.3d 507, 510 (Tenn. 2005); *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust,* 209 S.W.3d 602, 613 (Tenn. Ct. App. 2006).

All other issues raised on appeal are pretermitted.

## CONCLUSION

The decision of the trial court is affirmed in part, reversed in part, and vacated in part, as set forth above, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are assessed one-half against Petitioner/Appellee Brandon Williams and one-half against Respondent/Appellant Katie Singler, for which execution may issue, if necessary.


_____
HOLLY M. KIRBY, JUDGE